**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **JOSEPH S. ROBERTS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 12 C 828** |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **COLUMBIA COLLEGE CHICAGO,** | ) | |
| **ELIZA NICHOLS, and PHILIPPE** | ) | |
| **RAVANAS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Joseph S. Roberts sues defendants Columbia College Chicago ("Columbia"), Eliza Nichols, and Philippe Ravanas for breach of contract, retaliatory discharge, defamation and discrimination under Title VII, 42 U.S.C. §§ 2000e *et seq.*; 42 U.S.C. § 1981; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 *et seq.* This case is before the Court on defendants' motion for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following reasons, the Court grants the motion.

## BACKGROUND

Joseph Roberts, a 56-year-old naturalized United States citizen originally from India (Pl.'s LR 56.1(b)(3)(B) Resp. ¶ 1), worked as a tenure-track and, later, tenured professor at Columbia from 1999 to 2011 (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 12-13). His termination in 2011 is the basis for this lawsuit.

Professor Roberts taught in the Arts, Entertainment and Media Management ("AEMM") Department at Columbia. (*Id.* at 15-17.) His main area of scholarly interest and expertise is

entrepreneurship (*id.* at 110-11), and, after a few years at Columbia, he sought materials that might be useful in teaching economics to arts students (*id.* at 19). Roberts found that there existed no single textbook that was suitable for an economics course for arts students, and he wanted to spare his students the expense of purchasing multiple books, of which they would only use a portion, for a single-semester course. (*Id.* at 19-21.)

To remedy this problem, Roberts approached the McGraw-Hill Companies, Inc. ("McGraw-Hill") about publishing a "custom" textbook that would include and adapt chapters from several previously-published economics textbooks. (*Id.* at 21-23.) The three main source books were *Issues in Economics Today* by Robert C. Guell, *Economics Is Everywhere* by Daniel S. Hamermesh, and *Basic Economic Concepts* by Werner Sichel and Peter Eckstein. The first two books were recent publications of McGraw-Hill; the third was a 1974 book published by Rand McNally College Publishing Company. Roberts wrote an introductory first chapter, but the rest of his book, which he called *Economics for Arts Entrepreneurs and Managers*, was made up of chapters taken from the previously-published textbooks. (*Id.* at 29-31; *id.*, Ex. 1, at 1-2.)

Roberts hoped that the book could be finished in time to be used in his Fall 2004 courses, but he was still waiting for the publisher to send him the final proof of the book when the semester began. At the first class meeting of his economics course, he found that his students had already purchased the book from the college bookstore, although the publisher had never sent him a final proof or even an author's courtesy copy. (*Id.*, Ex. C, Roberts Dep. at 47-48.) Roberts purchased a copy for himself, and he found that the book contained numerous errors and omissions, including the omission of references, citations and a glossary he had expected McGraw-Hill to include. (*Id.* at 23, 52-53.) Roberts called to "let McGraw-Hill know" that the references were missing, but he "didn't try to correct it or anything" because he had decided, in

consultation with other faculty members, that they "were never going to use it again," (*id.* at 54, 57), because the book was a "total disaster" (*id.* at 61). In subsequent years, Roberts made efforts to revise the book with another instructor and publish it with an internal Columbia publishing service, but he abandoned the project before any revised book was completed. (*Id.* at 70-79.)

In 2007, Roberts led a search committee charged with finding a new dean for the School of Fine and Performing Arts, the school in which the AEMM department was housed. (*Id.*, Ex. A, Nichols Dep. Ex. 3.) When the search ended unsuccessfully because the two candidates the committee recommended were unable to come to terms with Columbia (*Id.*, Ex. C, Roberts Dep. at 83), Provost Steve Kapelke offered the position to Eliza Nichols, whom Columbia administrators had met at a recent conference, for a limited, renewable term of three years. (*Id.*, Ex. A, Nichols Dep. at 15-16; *id.*, Ex. 4.) Roberts publicly questioned whether it was appropriate to select a dean without formally "reopen[ing] the search" (*id.*, Ex. C, Roberts Dep. at 97), but Nichols was hired despite Roberts's objections. After Nichols's first term ended in 2010, she accepted an offer of a second three-year term. (*Id.*, Ex. A, Nichols Dep. at 8-9.)

In 2010, Roberts served on another search committee, this time for a chairperson of the AEMM department. (*Id.*, Ex. C, Roberts Dep. at 132.) At least initially, the search failed again, with the search committee's chosen candidate ultimately turning down the position. (*Id.*, Ex. B, Ravanas Dep. at 23.) Roberts claims that, rather than allowing the committee to meet again and recommend someone else based on fresh deliberations, Eliza Nichols forced the committee members to give her their second choice in a matter of minutes. (*Id.*, Ex. C, Roberts Dep. at 132.) Under pressure, the committee recommended Philippe Ravanas as a "reluctant second choice." (*Id.* at 133.) Roberts "expressed concern" about the way Columbia handled the matter

after the initial candidate withdrew, just as he had done when Columbia hired Nichols. (*Id.* at 132.)

Almost from the beginning of Ravanas's tenure as AEMM chair, there was friction between Roberts and Ravanas. Ravanas gave Roberts poor performance reviews (*id.*, Ex. B, Ravanas Dep. at 15-16), confronted Roberts about what Ravanas perceived to be his various professional faults and errors (Pl.'s Exs. Opp'n Summ. J., P-2, Roberts Decl. ¶¶ 70-74), and even seemed to solicit information that was critical of Roberts or damaging to him (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 180; *id.*, Ex. B, Ravanas Dep. Ex. 22, 24).

Ravanas allegedly made numerous comments to the effect that Roberts and some of the other older, tenured faculty members did not embody the "image" that he wanted the AEMM department at Columbia to have. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 7.) Roberts claims that Ravanas told him, "we are trying to create a young and hip look for the program and you and some of our colleagues do not fit that bill." (*Id.*) He removed a photo of Roberts from the online directory because he did not "project the look" that Ravanas wanted for his department. (*Id.*) Roberts also heard Ravanas make disparaging comments about "Asians and Asian immigrants." (*Id.* ¶¶ 6, 8.) Further, Ravanas once remarked "with displeasure" that Roberts's skin condition, vitiligo, which causes uneven pigmentation, was something that had to be "explained" to students, and, although the condition is entirely harmless, Ravanas repeatedly commented on it "with open distaste." (*Id.* ¶ 9.)

A number of tenured AEMM faculty, Roberts included, felt that Ravanas was mismanaging the AEMM department, both by making unwise decisions about AEMM courses and alienating faculty with his harsh management style. On May 2, 2011, Roberts and five of his colleagues communicated their concerns to Ravanas in a letter, with copies sent to Provost Steve

Kapelke and Dean Nichols. (Pl.'s Exs. Opp'n Summ. J., P-2, Roberts Decl. ¶¶ 76-77; Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. Ex. 26.) They sought to meet with Kapelke, but the meeting was twice canceled. They finally met with Louise Love, who had succeeded Kapelke as Provost, on May 31, 2011. (Pl.'s Exs. Opp'n Summ. J., P-2, Roberts Decl. ¶¶ 80.)

Meanwhile, in March of 2011, Nissan Wasfie, the AEMM lecturer and administrator who had joined Roberts in attempting to revise *Economics for Arts Entrepreneurs and Managers* until they had a falling-out in 2008, approached Ravanas with information about Roberts. Wasfie gave Ravanas a copy of Roberts's book and told Ravanas that he suspected Roberts of plagiarizing large portions of it from Sichel and Eckstein's *Basic Economic Concepts*. (Defs.' LR 56.1(a)(3) Stmt., Ex. B., Ravanas Dep. at 36-37.) Ravanas checked out a two-volume version of *Basic Economic Concepts* at a library and examined it alongside Roberts's book. (*Id.* at 37-39.) Roberts is listed as the lead author of *Economics for Arts Entrepreneurs and Managers*; he thanks his family on the dedication page and thanks the colleagues and graduate assistants who helped him prepare the book on a "Special Thanks" page. (Pl.'s Exs. Opp'n Summ. J., P-9 at 4-7.) The book contains no references other than the following short statement on the copyright page of the book:

> This book contains selected material from:
> *Issues in Economics Today* by Robert C. Guell. Copyright © 2003 by the McGraw-Hill Companies, Inc.
> *Economics Is Everywhere* by Daniel S. Hamermesh Copyright © 2004 by the McGraw-Hill Companies, Inc.
> This book also contains Original Material by Joseph S. Roberts.

(Pl.'s Exs. Opp'n Summ. J., P-9 at 5; Defs.' LR 56.1(a)(3) Stmt., Ex. B, Ravanas Dep. Ex. 2 (memo prepared by Ravanas).) The copyright page also contains the following statement: "McGraw-Hill's College Custom Series consists of products that are produced from camera-ready copy. Peer review, class testing and accuracy are primarily the responsibility of the

author(s)." (Pl.'s Exs. Opp'n Summ. J., P-9 at 5.) The chapters taken from *Basic Economics Concepts* are reproduced almost word for word, with some slight alterations to the explanatory examples, including changing products to "art" or "paintings," changing persons' names to those of the graduate assistants who helped Roberts prepare the book, and changing place names to the names of cities in Illinois. (Defs.' LR 56.1(a)(3) Stmt., Ex. B, Ravanas Dep. Ex. 2.) Ravanas prepared a memo summarizing and substantiating his conclusion that Roberts had plagiarized from Sichel and Eckstein (*see id.*), which he sent to Eliza Nichols in early April 2011 (*id.*, Ex. B, Ravanas Dep. at 31.) Nichols, in turn, alerted the provost's office and the general counsel's office. (*Id.*, Ex. A, Nichols Dep. at 27.)

On May 31, 2011, after Provost Love met with Roberts and the five faculty members who had complained about Ravanas, Nichols met with Roberts in her office. (Pl.'s Exs. Opp'n Summ. J., P-2, Roberts Decl. ¶ 81.) Their accounts of the meeting differ. Nichols contends that she asked Roberts to review Ravanas's memo with her and address the allegations contained within it, but Roberts "couldn't get past the first line," insisting that "the title of the book was incorrect, and therefore, he was not the author of the book"[1] that was the subject of the memo. (Defs.' LR 56.1(a)(3) Stmt., Ex. A, Nichols Dep. at 29.) Nichols attempted to go through the memo line by line, but Roberts was "very confusing" in his response (*id.*) and could give "absolutely no comprehensible excuse for what he did" (*id.* at 42).

Roberts claims that Nichols told him that he had committed plagiarism, without giving him any details about the alleged plagiarism, and he had five minutes to resign or he would be terminated. (Pl.'s Exs. Opp'n Summ. J., P-2, Roberts Decl. ¶ 82.) Roberts went back to his office to think about it, but he called Nichols after only a few moments to tell her that he would

---

[1] In the version of the memo that was produced in this litigation, the title of the book is correct: *Economics for Arts Entrepreneurs and Managers*. *Compare* Defs.' LR 56.1(a)(3) Stmt., Ex. B, Ravanas Dep. Ex. 2 *with* Pl.'s Exs. Opp'n Summ. J., P-9.

not resign.  (*Id.* ¶ 85)   He later received a written notice of dismissal from Provost Love, dated June 9, 2011, informing him that he was being terminated due to "academic dishonesty" under Section IX (A)(2) of his tenure agreement.  (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. Ex. 2.)  Columbia's Statement of Policy on Academic Freedom, Faculty Status, Tenure and Due Process ("Statement"), the document governing tenure and rights of tenured faculty, provides that tenured faculty can be dismissed for "cause," which is defined in pertinent part as:

> 1. Professional incompetence;
>
> 2. Dishonesty in teaching, creative endeavors, research, representation of credentials, or other professional activity relevant to the performance of College responsibilities; [or]
> . . . .
>
>  7. Other criminal, grave or egregious conduct manifestly inconsistent with continued faculty appointment.

(Compl. Ex. C, Section IX(A).)  This litigation followed.

## DISCUSSION

Roberts contends that the "academic dishonesty" for which he was ostensibly fired in 2011, seven years after the book was published, did not amount to "cause" that could properly result in termination under the Statement.  (Compl. ¶¶ 110-119.)  Rather, it is a mere pretext for retaliation against Roberts, an outspoken faculty advocate, for his organizing activities,[2] and discrimination against him on the basis of race, national origin, age and disability. (*Id.* ¶¶ 120-45, 152-58, 165-68, 173-176.)  Roberts also claimed that Ravanas defamed him when he told faculty members that Roberts was terminated for "incompetence and dishonesty," when Roberts was neither incompetent nor dishonest.  (*Id.* ¶¶ 177-96.)

---

[2] Roberts's complaint contains a retaliatory discharge claim under Illinois law (Compl. ¶¶ 120-35), as well as claims of retaliation under Title VII, Section 1981, and ADEA.  (*Id.* ¶¶ 146-51, 159-64, 169-72.)  However, he states in his opposition brief that "the record that has developed in this case does not fit well" with the Title VII, Section 1981 and ADEA retaliation claims, and "Prof. Roberts has elected to proceed without them."  (Mem. Opp. Summ. J. at 18 n.2.)  The Court considers these claims voluntarily dismissed.

The defendants deny Roberts's allegations of breach of contract, retaliation and discrimination, and they contend in their motion for summary judgment that his termination was based simply on his clear and unequivocal academic dishonesty. (Defs.' Mem. Supp. Summ. J. at 9-10; Reply Mem. at 3.) They also contend that any statement by Ravanas as to the reasons for Roberts's filing could only have been non-actionable opinion, not a defamatory statement of fact, and, to the extent it was a statement of fact, it was true. (Defs.' Mem. Supp. Summ. J. at 19-20; Reply Mem. 14-15.)

To prevail on a summary judgment motion, "the movant [must] show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At this stage, the court may not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000).

## I.    BREACH OF CONTRACT

In Count I of his Complaint, Roberts contends that Columbia breached its employment agreement with him by terminating him without cause and failing to "correct his conduct" by less severe means than termination.

According to Roberts, the Statement requires Columbia, if it intends to terminate a tenured faculty member for cause, to "undertake such investigation and comply with such procedures as [the Provost/Senior Vice-President] believes appropriate." (Compl. Ex. C, Section IX.D.2.a.) He claims that there was virtually no investigation in this case and, if Columbia had conducted even a minimal investigation, or at least given Roberts some opportunity to respond to the allegations, it would have discovered that what appeared to be "academic dishonesty" was

merely a publisher's error that did not provide "cause" for his dismissal. (Pl.'s Mem. Opp'n Summ. J. at 8-9.)

Roberts claims that McGraw-Hill told him that he could use non-McGraw-Hill source material in his book and McGraw-Hill would handle all copyright and intellectual property issues, and he sent McGraw-Hill photocopies of the Sichel and Eckstein book's cover page, publication information and bibliography. He expected McGraw-Hill to include appropriate references in the text, which it did not do. He also expected McGraw-Hill to send him a final proof of the book before it was printed and shipped to the bookstore, which it did not do; in fact, Roberts never had any opportunity to examine the book in final form until he went to the bookstore to buy a copy himself, after his students had already purchased the book for the Fall 2004 semester. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶14-25.) In Roberts's view, he therefore had no chance to correct the omission of the references before the book was published, and he should not have been forced to pay for McGraw-Hill's error with the loss of his job.

Further, the Statement provides that "[p]rior to dismissing . . . a faculty member, the College will, in ordinary circumstances, attempt to correct the conduct giving rise to Cause by other less severe action." (Compl. Ex. C, Section IX.D.1.) Roberts contends that Columbia's terminating him based on an inadvertent citation error committed many years ago was inconsistent with its obligation to correct sanctionable conduct by way of "less severe action" than dismissal if possible. (*Id.* ¶ 117.)

Defendants contend that "the sufficiency of Love's investigation and conclusion is supported by the undisputed facts" because "plagiarism is plagiarism." (Reply Mem. at 3.) It is undisputed that (a) eight of the nineteen chapters in Roberts's book are substantially copied from another book without attribution (Pl.'s LR 56.1(b)(3)(B) Resp. ¶ 11); (b) Roberts never took any

action to have the publisher correct the attribution error, such as by recalling the book or producing an errata sheet (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 54, 57); and (c) Roberts listed the book on his curriculum vitae ("CV") in 2009 and 2011, even knowing that references were missing from the book (*Id.* at 185-86).

The Court agrees with defendants that, even if all of Roberts's allegations concerning the creation and publication of the book are true, the evidence does not support Roberts's claim that he was terminated without cause. Roberts's explanation for the book's citation and reference errors—that they were accidental and, having discovered them only after publication, he did not correct them because he decided never to use the book again—simply does not undermine Columbia's reasonable, good-faith determination that he had committed academic dishonesty.

The Statement does not specifically define plagiarism or academic dishonesty, but plagiarism is often defined without reference to intent. *See, e.g., Seitz-Partridge v. Loyola Univ. Chi.*, 987 N.E.2d 34, 42-43 (Ill. App. Ct. 2013), *Fry v. Lee*, No. 12CA1575, 2013 WL 3441546, at *7 (Colo. Ct. App. June 20, 2013) (citing authorities); *see also* Stuart P. Green, *Plagiarism, Norms, and the Limits of Theft Law,* 54 Hastings L.J. 167, 181-82 (2002) (arguing that plagiarism need not be intentional if the plagiarist is "deliberately indifferent to the requirements of attribution"). Roberts assumes that if the book's attribution errors are unintentional, they are not "academic dishonesty," but the Court finds no basis for this assumption, at least in the context of this case. A book is a permanent object that maintains its existence regardless of whether its author uses it to teach a class; Roberts admits that he allowed errors to stand, in a book for which he claimed lead author credit, without making any attempt to correct them or separate himself from them. Indeed, quite to the contrary, Roberts continued to list the book on his CV. He contends that this action, too, was inadvertent or an "oversight" (Defs.' LR

56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 185-86), but Roberts has not demonstrated, and the Court fails to see, why Columbia could not conclude, reasonably and in good faith, that these acts amount to "deliberate indifference to the obligation to attribute" as serious as intentional dishonesty, *see* Green, 54 Hastings L.J. at 182.

Further, Columbia could conclude that any "less severe" punishment for such a serious breach of professional standards would be "inappropriate and contrary to the best interests of the College because of the nature or seriousness of the conduct" (Compl. Ex. C, Section IX.D.1.) because Roberts's "violation of the standard of academic integrity was quite egregious" (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. at 20); again, Roberts makes no showing that would undermine any such conclusion.

Roberts also contends that the lack of any meaningful investigation or process affording him the opportunity to defend himself before being terminated was itself a breach of contract. Defendants reply that the contract requires the provost to perform only such investigation "as he or she believes appropriate" (Compl. Ex. C, Section IX.D.2.), and this language does not require Columbia's investigation to meet any standard of reasonableness or good faith. (Reply Mem. at 5.)

The Court does not entirely agree with defendants. Illinois law required Columbia to act in accordance with the implied duty of good faith and fair dealing inherent in any contract, employment or otherwise. *See Beasley v. St. Mary's Hosp. of Centralia*, 558 N.E.2d 677, 682 (Ill. App. Ct. 1990). Nevertheless, as defendants argue, there is no evidence or even allegations that Love did not act in good faith in reviewing the evidence, as compiled by Ravanas and passed on to her by Nichols, and concluding that Roberts committed plagiarism. A simple comparison of Roberts's 2004 book alongside the 1974 source book, which Love made to arrive at her

decision (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. at 22), could support termination for academic dishonesty in good faith (or even based on a reasonable-person standard), and Roberts fails to present evidence or even allege that Love, the final decision-maker who actually terminated him, had any ulterior motive or animus that prevented her from acting reasonably or in good faith. (Pl.'s LR 56.1(b)(3)(B) Resp. ¶ 47 (admitting that Love had no discriminatory animus against Roberts).) *See Beasley*, 558 N.E.2d at 682.

Even viewing all facts in the light most favorable to Roberts, Roberts cannot demonstrate that Columbia breached its contract with Roberts by terminating him without valid cause. The court grants defendants' motion for summary judgment on this claim.

## II.     RETALIATORY DISCHARGE

Roberts claims that he was discharged in retaliation for certain organizing activities on behalf of the AEMM faculty. These activities included protesting, in concert with colleagues, against the hiring of Dean Nichols without formally reopening the search process and against the performance of Ravanas as chair of the AEMM department, as described above. (Compl. ¶¶ 126-35.) Roberts also claims that he advocated on behalf of faculty generally as a member of bodies such as the Columbia College Faculty Organization and the Faculty Senate, and he worked to bring a chapter of the American Association of University Professors to Columbia to organize tenured faculty further. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 10-13.)

Defendants contend that this claim is preempted by the National Labor Relations Act ("NLRA"). (Reply Mem. at 6-7.)[3] The court agrees. In *Beaird v. Miller's Mutual Insurance Association*, 479 N.E.2d 374, 375-76 (Ill. App. Ct. 1985), the Illinois Appellate Court held that the plaintiff's claim that he was discharged in retaliation for associating with an organization that

---

[3] Although defendants raise this claim for the first time in their reply brief, a preemption defense is not waivable. *Veal v. Kerr-McGee Coal Corp.*, 682 F. Supp. 957, 960 (S.D. Ill. 1988).

sought to unionize defendant's insurance agents was preempted by sections 7 and 8 of the NLRA, 28 U.S.C. §§ 157-58. Roberts's claim that he was discharged in retaliation for his efforts on behalf of faculty at Columbia is similar to the plaintiff's claim in *Beaird*, and it warrants the same result. His claim is preempted.

Even if Roberts's claim were not preempted, it would fail because Roberts fails to show that his termination was actually caused by his protected concerted activities. To prevail on a claim of retaliatory discharge under Illinois law, a plaintiff must show that (1) he was discharged (2) in retaliation for his activities, and (3) the discharge violates a clear mandate of public policy.[4] *Hartlein v. Ill. Power Co.*, 601 N.E.2d 720, 728 (Ill. 1992). "The element of causation is not met if the employer has a valid basis, which is not pretextual, for discharging the employee." *Id.*

Roberts conclusorily states, without elaborating, "that he engaged in protected activity . . . and . . . he was discharged for that activity." (Pl.'s Mem. Opp'n S. J. at 15-16.) He does not explain the causal connection between the protected activity and his termination, nor does the evidence disclose any such connection. As explained above, Columbia had a valid basis for discharging Roberts—Roberts committed plagiarism—and there is no evidence that Roberts's plagiarism was a mere pretext for terminating him for his organizing activities. It is true that evidence shows that at least Ravanas, if not also Nichols, was relieved to be rid of Roberts (Defs.' LR 56.1(a)(3) Stmt., Ex. B, Ravanas Dep. Ex. 11), but the evidence reveals no basis for any suspicion that Love, the person who actually had the authority to terminate Roberts and who actually decided to do so, fired Roberts for any reason other than her own reasonable, good-faith

---

[4] Defendants also contend that Roberts's retaliatory discharge claim fails because he did not engage in organizing activities that were protected by "a clearly mandated public policy" such that the "limited and narrow" tort of retaliatory discharge might lie. (Reply Mem. at 8-9 (citing *Jacobson v. Knepper & Mogga. P.C.*, 706 N.E.2d 491, 492-93 (Ill. 1998)). Although the Court is inclined to agree that Roberts may be stretching the tort of retaliatory discharge beyond its limits, it need not resolve this issue because it is clear that Roberts's claim fails to show causation.

determination that his "violation of the standard of academic integrity was quite egregious." (*Id.*, Ex. F, Love Dep. at 20.)

As defendants argue in their reply brief, Roberts's claim of retaliatory discharge is based on no more than "unsupported assertions, opinions and conclusory, self-serving statements" that Roberts and his colleagues made in deposition testimony and declarations, *see Davis v. Times Mirror Magazines, Inc.*, 697 N.E.2d 380, 386 (Ill. App. Ct. 1998), as well as "an overload of irrelevant or nonprobative facts," which do not "add up to relevant evidence," *see Gorence v. Eagle Food Centers, Inc.*, 242 F.3d 759, 763 (7th Cir. 2001), that Roberts was fired because of his protected organizing activities. (Reply Mem. at 11.) He could not prevail at trial on his retaliatory discharge claim even if this court could reach the merits of the claim, and the court grants the defendants' motion for summary judgment as to this claim.

## III.    DISCRIMINATION

Roberts claims in Counts III, V, VII and IX of the complaint that Columbia discriminated against him under Title VII, Section 1981, the ADA and the ADEA. He contends in his opposition brief that he has offered circumstantial evidence, under the direct method of proof, that amounts to a "convincing mosaic of discrimination." (Pl.'s Mem. Opp'n Summ. J. at 16 (citing *Troupe v. May Dep't Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).) Circumstantial evidence of discrimination may be comprised of "(1) ambiguous statements or behavior towards other employees in the protected group; (2) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive better treatment; and (3) evidence that the employer offered a pretextual reason for an adverse employment action." *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). "A plaintiff need not produce evidence in each category to survive summary judgment." *Id.*

Roberts claims to have offered circumstantial evidence of discrimination consisting of (a) "ambiguous statements by Chair Ravanas regarding Asians, older faculty members, and his skin disease" (*see* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6-9), and (b) "definitive evidence that Columbia's stated reason for terminating him—plagiarism—was pure pretext." (Pl.'s Mem. Opp'n Summ. J. at 17.)

**A. Ambiguous Statements by Ravanas**

With regard to the "ambiguous statements by Chair Ravanas," the court notes initially that, as already explained in Part II of this order, Ravanas did not fire Roberts; Love did. True, Ravanas set the process in motion by investigating the allegations of plagiarism that Wasfie brought to his attention and documenting the similarities between Roberts's book and the Sichel and Eckstein book in his memo to Nichols. However, the evidence before the court shows that Love decided to terminate Roberts based only on a review of the materials Nichols gave her. (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. at 22.) Love testified at her deposition that she recalled discussing Roberts's potential termination only with Nichols, and, although she recalled reviewing the memo prepared by Ravanas, she did not know that Ravanas was the one who prepared it (*id*. at 75); Love apparently was not even aware of the extent of Ravanas's role in the investigation. Because Ravanas played no direct role in the termination decision, any statements he made that are unrelated to the employment action at issue are not probative of a "discriminatory reason for the employer's action."[5] *Burnell v. Gates Rubber Co.*, 647 F.3d 704, 708 (7th Cir. 2011); *see Martin v. Nw. Mut. Life. Ins. Co.*, 288 F. App'x 292, 296-97 (7th Cir. 2008).

---

[5] As defendants point out, Roberts himself suggested at his deposition that Ravanas and Nichols may have pushed for his firing because he had opposed their selection as chair and dean, (Roberts Dep. at 82, 108, 131; Comp. ¶¶ 28-34, 40-41), a motive that, even if true, does not support his claims. (Reply Mem. at 10).

Further, even if it were true that Ravanas was the final decision-maker, his statements regarding Asians, older faculty members and Roberts's skin disease (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 6-9) would be inadequate to demonstrate a discriminatory motive for Roberts's termination. These vague and isolated statements are no more than "stray remarks," *see Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 865 (7th Cir. 2011), that, while rude and insensitive, are too remote from the employment decision at issue to defeat summary judgment.

There is evidence that Ravanas dealt harshly with Roberts and some of the other tenured faculty members, perhaps based on a belief that the AEMM department had been poorly managed by the previous chair and needed to be shaken up to improve its performance. (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. at 53-55; *id.*, Ex. 5 at 5-6; *id.*, Ex. 6.) Ravanas may even have disliked Roberts—certainly, they had numerous disagreements concerning how the AEMM department should operate and how Roberts should perform his job duties. But whatever animus Ravanas may have had against Roberts, the few isolated statements Roberts attributes to him about Asians, older faculty members and Roberts's skin disease do not show that his hostility was based on Roberts's race, national origin, age or skin condition. Further, any hostility Ravanas harbored toward Roberts did not come into play in the decision to terminate Roberts, which was made by Louise Love, not by Ravanas or with his direct input.

**B. Pretext**

Roberts claims, without elaborating, that Columbia's stated reason for terminating Roberts was "pure pretext." As explained in part in Parts I and II above, the evidence does not support this position.

The only facts Roberts cites in support of his contention that plagiarism was a mere pretext for his firing are facts related to the compilation of his book and his assertion that the

problems with the book were well known in the AEMM department at the time the book was originally published in 2004. (Mem. Opp'n Summ. J. at 17-18 (citing Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 14-25).)

Roberts testified that his colleagues knew that he had attempted to design a textbook in 2004 and that the effort was an utter failure, to which they referred in shorthand as "the book controversy." (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 61.) He discussed the "book controversy" with some of them at the time. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 25.) According to Roberts, Nissan Wasfie, in particular, must have known about the book's problems long before 2011 because he had helped Roberts in his attempt to revise the book and re-submit it to another publisher in the years after the failed attempt to publish it with McGraw-Hill. (Defs.' LR 56.1(a)(3) Stmt., Ex. C, Roberts Dep. at 75-76.) Roberts argues that, considering that the attribution errors in the book were well known in the AEMM department since 2004, they cannot have been the real reason for firing him in 2011.

However, the evidence does not show that Louise Love, who was not a member of the AEMM department, knew of the "book controversy" before 2011, and it would not matter if she did. Louise Love, having just taken over the position of provost from Steve Kapelke, was presented in 2011 with evidence that Roberts had plagiarized large portions of his book, and she decided to terminate him because his "violation of the standard of academic integrity was quite egregious." (*Id.*, Ex. F, Love Dep. at 20.) The evidence discloses no reason to doubt that her decision was fairly and honestly made, based only on the evidence of plagiarism, rather than some discriminatory motive. (*Id.* at 22; Pl.'s LR 56.1(b)(3)(B) Resp. ¶ 47.)

Roberts argues at times in his brief that Love's investigation was inadequate and that she should have sought an explanation for his book's attribution errors directly from him,

independent of his May 31, 2011 conversation with Nichols, before terminating him. (Pl.'s Mem. Opp'n Summ. J. at 8-9.) He also suggests that, given the accidental, inadvertent nature of the attribution errors and omissions in the book, dismissal was not an appropriate punishment. (Compl. ¶ 117.) However, to the extent that he believes these arguments support his contention that plagiarism was a mere pretext for his firing because no one could have fairly concluded that he committed plagiarism worthy of dismissal based only on a bare comparison of the books, the court disagrees. Even if the investigation was brief and his dismissal a harsh punishment, they were not so unreasonable as to support, without more, an inference that plagiarism was a mere pretext, not when Roberts indisputably copied large portions of his book from another author's textbook and made minor changes that seemed generally motivated to make the book "appear to be more his." (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. at 22.)

Roberts's theory of pretext is speculative at best. *See Naficy v. Ill. Dep't of Human Servs.*, 697 F.3d 504, 513 (7th Cir. 2012); *Overly v. KeyBank Nat'l Ass'n*, 662 F.3d 856, 864 (7th Cir. 2011) ("[R]eliance on speculation is not enough to get the case to a jury."). Roberts may have been treated unfairly, but the courts do not sit as "super-personnel departments" to review the wisdom or correctness of an employer's decision, *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006); rather, they are concerned only with whether an employer's stated nondiscriminatory ground for the action of which the plaintiff complains is the true ground, not a pretext for discrimination. *Forrester v. Rauland-Borg Corp.*, 453 F.3d 416 (7th Cir. 2006). Love decided to terminate Roberts based on what reasonably appeared to be a clear case of academic dishonesty, and the evidence does not support any contention that Roberts's plagiarism was not the real reason for his termination.

There is no genuine issue of material fact concerning Roberts's discrimination claims. Defendants' motion for summary judgment is granted as to these claims.

## IV.   DEFAMATION

Defendants contend that they are entitled to summary judgment on Roberts's claim that Ravanas defamed him by telling a number of his colleagues, in reference to Roberts's termination, that Roberts "is gone and I don't want to say anything about that, but I will say that none of us can get away with incompetence and dishonesty." (Compl. ¶ 182.) Defendants contend that the statement was a non-actionable opinion, not a false statement of fact. The court agrees.

To prevail on a claim of defamation *per se* under Illinois law, a plaintiff must prove "(1) that the defendant made a false statement concerning the plaintiff; (2) that there was an unprivileged publication of the defamatory statement to a third party by the defendant; and (3) that the plaintiff was damaged." *Seitz-Partridge v. Loyola Univ. Chi.*, 987 N.E.2d 34, 41 (Ill. App. Ct. 2013). The Illinois Appellate Court has recently explained the distinction between actionable statements of fact and non-actionable opinions:

> In defamation actions, statements that are capable of being proven true or false are actionable, whereas opinions are not. *Moriarty v. Greene*, 732 N.E.2d 730, 739 (Ill. App. Ct. 2000). . . .   The test for determining whether an allegedly defamatory statement of opinion is actionable is "whether the statement contains an objectively verifiable assertion." *Wynne v. Loyola Univ. Chi.*, 741 N.E.2d 669, 676 (Ill. App. Ct. 2000). Whether a statement is an opinion or a factual assertion is a question of law. *Brennan v. Kadner*, 814 N.E.2d 951, 957 (Ill. App. Ct. 2004).

*Id.* at 43.

Statements that an employee was discharged because he was incompetent have been held to be non-actionable opinions. *Marron v. Eby-Brown Co., LLC*, No. 1:11-cv-2584, 2012 U.S. Dist. LEXIS 7298, at *12-13 (N.D. Ill. Jan. 23, 2012); *Hopewell v. Vitullo*, 701 N.E.2d 99, 103-

04 (Ill. App. Ct. 1998). The Court reaches the same conclusion here. "[T]he question of whether a statement of opinion is actionable as defamation is one of degree; the vaguer and more generalized the opinion, the more likely the opinion is non-actionable as a matter of law." *Seitz-Partridge*, 987 N.E.2d at 43 (citing *Wynne*, 741 N.E.2d at 676). Ravanas's bare assertion that Roberts was incompetent, without any additional details, was too vague to be an actionable statement of fact. *See Hopewell*, 701 N.E.2d at 103-04.

The same is true for Ravanas's statement regarding Roberts's "dishonesty." The statement, by itself, with no accompanying details, is exceedingly vague and therefore non-actionable. Further, even if the statement were an actionable statement of fact, "[t]ruth is an absolute defense to defamation and true statements cannot support a claim of defamation," *Seitz-Partridge*, 987 N.E.2d at 41, and it is substantially true that Roberts was fired for "dishonesty." The letter Roberts received from Love informing him of his termination stated that he was terminated for "academic dishonesty" (Defs.' LR 56.1(a)(3) Stmt., Ex. F, Love Dep. Ex. 2) and, as the Court has explained above, this reason was not pretextual; it was the actual reason for Roberts's termination.

Ravanas's statement cannot support a defamation claim because, to the extent he stated that Roberts was fired for incompetence, it is non-actionable opinion, and to the extent he stated that Roberts was fired for dishonesty, it is both a non-actionable opinion and a true statement. Defendant's motion for summary judgment is granted as to Roberts's defamation claim.

## CONCLUSION

For the reasons set forth above, the Court grants defendants' motion for summary judgment [51]. This case is terminated.

**SO ORDERED.**

ENTERED: **4/21/15**

**HON. JORGE L. ALONSO**
**United States District Judge**